CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED
AUG 09 2007
JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

| | |
|---|---|
| SANDRA K. RINGLEY,<br>Plaintiff, | Civil Action No. 2:06cv00057 |
| v. | **MEMORANDUM OPINION** |
| MICHAEL J. ASTRUE,[1]<br>**Commissioner of Social Security,**<br>Defendant. | By: GLEN M. WILLIAMS<br>SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration.

*I. Background and Standard of Review*

Plaintiff, Sandra K. Ringley, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Ringley protectively filed her applications for DIB and SSI on May 13, 2004, alleging disability as of October 27, 2003, due to back pain. (Record, ("R."), at 49-52, 56, 267-70, 290.) Her claims were denied initially and upon reconsideration. (R. at 39-41, 272-76, 278-80.) Ringley then requested a hearing before an administrative law judge, ("ALJ"). (R. at 25-29.) A hearing was held on October 6, 2005, at which Ringley, who was represented by counsel, appeared and testified. (R. at 282-304.)

By decision dated December 5, 2005, the ALJ denied Ringley's claim. (R. at 15-24.) The ALJ found that Ringley met the disability insured status requirements of the Act for disability purposes through the date of his decision. (R. at 23.) The ALJ also found that Ringley had not engaged in any substantial gainful activity since her alleged onset of disability. (R. at 23.) The ALJ noted that Ringley was a younger individual with a "marginal education." (R. at 23.) The ALJ determined, after careful examination of all the medical records, that Ringley's degenerative disc disease of the

lumbar spine was a severe impairment. (R. at 23.) However, the ALJ found that none of Ringley's impairments met or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ stated that the claimant's allegations of disabling pain and other limitations were not totally credible. (R. at 23.) The ALJ found that Woods had the residual functional capacity to perform a significant range of simple, low stress work at the light level of exertion.[2] (R. at 23.) As a result, the ALJ determined that Ringley could not perform any of her previous semi-skilled work and that she did not have any transferable skills. (R. at 23.) Based on Ringley's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Ringley could perform jobs that existed in significant numbers in the national economy, including those of an inspector, a cleaner, a food services employee, a hand packer and an assembler. (R. at 24.) Therefore, the ALJ found that Ringley was not under a "disability," as defined in the Act, at any time through the date of his decision. (R. at 24.)

After the ALJ issued his decision, Ringley pursued her administrative appeals. (R. at 8-14.) The Appeals Council declined her request for review on September 7, 2006. (R. at 8-11.) Ringley then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1482 (2006). The case is now before the court on Ringley's motion for summary judgment filed March 22, 2007, (Docket Item No. 14), and on the

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

Commissioner's motion for summary judgment filed May 15, 2007, (Docket Item No. 20).

## II. Facts

Ringley has not challenged any of the ALJ's findings with respect to her alleged mental impairments. As a result, the facts discussed will focus on the medical records relevant to her complaints of physical impairments. Ringley was born in 1961, which classified her as a "younger individual" pursuant to 20 C.F.R. §§ 404.1563(c), 416.963(c), at the time of the ALJ's decision. (R. at 19, 49, 52, 267.) Ringley completed six grades of formal education[3] and she had past relevant work experience as a cook. (R. at 19, 57, 285.)

At her hearing on October 6, 2005, Ringley testified that she had been unable to work for two and a half years due to lower back pain. (R. at 287, 290.) Ringley described her back pain as a "bad ache" that would not go away. (R. at 291.) She stated that she took medication prescribed by Dr. G. S. Kanwal, M.D., but she was not able to take strong medication due to nausea. (R. at 291.) Ringley also added that she was unable to afford all of the medications prescribed by Dr. Kanwal after she lost her medical insurance, but she continued to take Darvocet for pain. (R. at 291-92.)

Ringley stated that she was "getting arthritis in [her] whole body" and that, in addition to her back pain, her legs, ankles and shoulders also ached "all the time." (R.

---

[3] While Ringley's Adult Disability Report filed with the Social Security Administration, ("SSA"), indicates that she completed the seventh grade, she stated in her testimony before the ALJ that she had only completed the sixth grade before electing to quit school while she was in the seventh grade. (R. at 62, 285.)

at 293-94.) Besides Dr. Kanwal, Ringley stated that she received treatment for her back pain from a chiropractor. (R. at 293.) She testified that she could only stand for 15 or 20 minutes before her legs would get tired and begin hurting. (R. at 294.) She also testified that she could not sit for more than 15 to 20 minutes. (R. at 294.) Ringley stated that she could not lift or carry anything; however, when questioned, she admitted that she was able to lift things around the home such as dishes. (R. at 294.) She also stated that she tried to mop, sweep and vacuum, but it was painful. (R. at 294-95.)

Ringley testified that she did not sleep well, that she had bad ulcers and that she had gained 20 pounds since she stopped working. (R. at 296-97.) Ringley stated that she could drive a car and that she drove herself to the store and to visit her father. (R. at 297.) She also stated that she occasionally went out to eat with her boyfriend and friends of her boyfriend. (R. at 298.) She noted that her social activities had been limited by her impairments. (R. at 298-99.) However, she did indicate that she attempted to perform some part-time work filling vending machines in 2004. (R. at 299-300.)

Donna Bardsley, a vocational expert, also testified at Ringley's hearing. (R. at 301-03.) Bardsley testified that Ringley's past relevant work experience as a cook was medium exertion[4] and semi-skilled. (R. at 302.) The ALJ asked Bardsley whether there were any jobs available that could be performed by a hypothetical individual with the same age, education and work background as Ringley, but who was restricted

---

[4] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do light work or sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

to simple, low stress light work. (R. at 302.) Bardsley responded that there were jobs in the regional and national economies that such an individual could perform. (R. at 302.) Bardsley stated that the hypothetical individual could perform jobs such as a cleaner, a hand packager, a sorter, an assembler, an inspector and the individual could perform food service related occupations. (R. at 302.)

The ALJ next asked Bardsley to add the restrictions listed in exhibit 13F, a medical assessment prepared by Dr. Kanwal, which would limit the hypothetical individual to lifting 15 pounds occasionally, lifting 10 pounds frequently and standing or walking two to three hours in an eight-hour day. (R. at 303.) It also limited the individual to sitting two to four hours during an eight-hour workday and only one-half hour without interruption. (R. at 303.) Furthermore, it stated that the individual could not stoop, kneel, crouch or crawl, and would have difficulty reaching, pushing or pulling. (R. at 303.) Bardsley opined that there would be no jobs available for a person with these additional restrictions. (R. at 303.) Finally, Bardsley added that her testimony was consistent with the dictionary of occupational titles. (R. at 303.)

In rendering his decision, the ALJ reviewed records from Dr. G. S. Kanwal, M.D.; Danny J. Minor, D.C.; Cloverleaf Chiropractic/Theresa Dunton, D.C.; Dr. S. C. Kotay, M.D.; B. Wayne Lanthorn, Ph.D., a state agency psychologist; Richard J. Milan, Jr., Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Donald R. Williams, M.D., a state agency physician; and Eugenie Hamilton, Ph.D., a state agency psychologist; Coeburn Middle School; Rite Aid Pharmacy and Coeburn Hospital Clinic.

Ringley was treated by Dr. G. S. Kanwal, M.D., from January 10, 2002, to October 29, 2004, and again from December 13, 2004, to August 25, 2005.[5] (R. at 115-44, 257-66.) However, it is evident that on January 11, 2002, a radiology report was prepared by Dr. Subhash Saha, M.D., at the request of Dr. Kanwal regarding a chest x-ray performed on Ringley. (R. at 140.) Based on the report, Ringley's x-ray indicated a mild degree of degenerative change in the dorsal spine. (R. at 140.) Thereafter, on January 28, 2002, Ringley complained to Dr. Kanwal of a "hip and back ache." (R. at 128.)

A magnetic resonance image, ("MRI"), was performed on Ringley's lower spine on April 29, 2002, which indicated multilevel disc degeneration. (R. at 139.) However, there was no evidence of disc protrusion, extrusion or herniation. (R. at 139.) Additionally, the central spinal canal and intervertebral canals were adequate at all levels, there was no sign of any abnormal marrow signal and the conus medullaris was normal. (R. at 139.)

On November 10, 2002, Ringley presented to Dr. Kanwal with several complaints including lower back pain radiating into her left knee and leg. (R. at 129.) A radiology report from another chest x-ray from April 2, 2003, yielded a diagnosis of mild spondylosis. (R. at 138.) On June 11, 2003, Ringley appears to have been prescribed Darvocet and on July 9, 2003, Ringley returned to Dr. Kanwal with complaints of leg and back pain. (R. at 122.) Ringley's complaints of chronic back pain and left leg pain continued on August 27, 2003. (R. at 121.) Also in August 2003, it appears that Ringley was given shots in her back and legs. (R. at 121.)

---

[5] These records are almost entirely illegible.

In October 2003, Ringley visited Danny J. Minor, D.C., with complaints of lower back pain, left leg pain, left ankle pain, neck pain and shoulder pain. (R. at 146.) Ringley indicated that her chronic pain was exacerbated when she had recently gone dancing. (R. at 146.)

In late October 2003, Ringley was seen by Cloverleaf Chiropractic for her complaints of back and neck pain. (R. at 155-61, 225-236.) She indicated that most of the time nothing made her pain worse, but that walking, bending and stretching could cause aggravation. (R. at 159, 225.) She also indicated that she was taking Darvocet or Aleve for pain. (R. at 159, 225.)

X-rays of Ringley's lateral, cervical, nasium and base posterior spine were taken. (R. at 161, 232.) The x-rays of Ringley's neck were unremarkable and the x-rays of her cervical spine found her disc spaces to be well maintained with no evidence of any articular degeneration and no evidence of osseous anomalies. (R. at 161, 232.) A loss of normal lordosis was noted on the cervical spine. (R. at 161, 232.) X-rays of her lumbar spine found that her soft tissues in the lumbar region were unremarkable, her disc spaces were well maintained and she had no evidence of any articular degeneration or osseous anomalies. (R. at 160, 231.) Slight hyperlordosis, mild right rotatory scoliosis and lumbosacral facet syndrome were noted. (R. at 160, 231.) A anterior angulation defect was also noted correlating to the patient's history of injury. (R. at 160, 231.) None of Ringley's x-rays found any fracture or dislocation. (R. at 160-61, 231-32.)

-8-

Case 2:06-cv-00057-GMW-PMS   Document 22   Filed 08/09/07   Page 8 of 19   Pageid#: 64

Ringley was given instruction by Theresa A. Dunton, D.C., not to work from October 27, 2003, until November 2, 2003, and again instructed not to return to work from November 3, 2003, until November 11, 2003. (R. at 150, 154.) During this period of treatment, Ringley was consistently found to have moderate tenderness to the lumbar and thoracic area. (R. at 149, 151-53, 233-36.) However, Ringley did note some improvement in her pain and by November 10, 2003, she had returned to work with only complaints of "some soreness in her neck." (R. at 149, 151-53, 233-36.)

On November 16, 2003, Ringley returned to Dr. Kanwal with complaints of lower back pain and left leg pain and she requested another shot in her back. (R. at 120.) Ringley did not see Dr. Kanwal again until February 3, 2004, when she returned with complaints of hip pain. (R. at 119.) Ringley again complained of back pain on April 20, 2004, and April 22, 2004. (R. at 118.) On April 22, 2004 she was given shots in her back. (R. at 118.) By June 1, 2004, Ringley continued to complain of lower back pain radiating into her left leg which she described as being between a four and a seven on a scale of one to ten. (R. at 117.) Dr. Kanwal provided an impression of degenerative joint disease in the lumbar spine and radiculopathy. (R. at 117.) Dr. Kanwal also referred Ringley to Dr. S. C. Kotay, M.D. (R. at 117.)

On June 24, 2004, Ringley had x-rays taken of her right knee at the request of Dr. Kotay, which found no joint effusion, well preserved joint spaces, no erosive changes and no abnormalities. (R. at 173.) An MRI was performed on Ringley's left knee, which found no abnormal joint effusion, no problems with the meniscus, no ligament damage and a normal patella position. (R. at 171.) A small cyst was found adjacent to the lateral meniscus, but no meniscal tear was found. (R. at 171.)

In June 2004, an MRI was also performed on Ringley's lumbar spine which demonstrated multilevel disc degeneration, just as her 2002 MRI had demonstrated. (R. at 169.) The MRI found the T12-L1, L1-2, L2-3 and L3-4 levels to be well preserved with mild disc degeneration. (R. at 169.) The L4-5 level was well preserved and the L5-S1 level demonstrated minimal disc space narrowing with disc degeneration, but no focal disc herniation. (R. at 169.) Her vertebral alignment was normal, marrow signal was benign, conus medullaris was above L2 and the central spine and intervertebral canals were adequate. (R. at 169.) Additionally, x-rays were taken of her lumbar spine which found that her disc spaces were well maintained and her pedicles were intact. (R. at 168.) The conclusion from the x-rays was mild spondylosis. (R. at 168.)

Dr. Kotay noted that her lumbar spine motion was well preserved, her straight leg raising test was positive on the left side at 60 degrees, her motor power was preserved and her right knee was normal. (R. at 165.) On July 8, 2004, Dr. Kotay reported "clinically no positive findings." (R. at 163.) He stated that the MRIs performed on the spine showed degenerative disc disease but no nerve root compression. (R. at 163.) The MRI of her knee showed an anterior horn tear of the lateral meniscus, which could have required arthroscopy. (R. at 163.) There is no record that any arthroscopy was performed.

On August 18, 2004, B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, evaluated Ringley at the request of Disability Determination Services, ("DDS"). (R. at 174-80.) Ringley stated she applied for disability because of arthritis in her lower back and left leg pain. (R. at 174.) Ringley indicated that her physicians had informed her that she had arthritis and possibly fibromyalgia. (R. at 174-75.) The

-10-

majority of Lanthorn's report deals with Ringley's alleged mental impairments. (R. at 174-80.) Lanthorn notes that Ringley reported that she regularly took care of her father with Alzheimer's disease and her mother with fibromyalgia. (R. at 176-77.) She also reported doing housework, laundry, cooking, cleaning, going to the grocery store, driving alone, traveling alone and going out to eat with a friend. (R. at 177.) After observation, Lanthorn found Ringley to be malingering on the testing he performed; however, he noted that her "poor effort at this time does not necessarily negate legitimate health problems." (R. at 180.)

A Psychiatric Review Technique Form, ("PRTF"), was prepared on September 10, 2004, by Richard J. Milan, Jr., Ph.D., a state agency psychologist. (R. at 181-95.) He indicated that Ringley malingered in her performance on intellectual testing and that her mental allegations were partially credible. (R. at 193.) This was affirmed by another state agency psychologist, B. Wayne Lanthorn, Ph.D., on October 28, 2004. (R. at 147.)

On September 10, 2004, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"). (R. at 196-203.) He opined that Ringley was able to occasionally lift items weighing up to 20 pounds and to frequently lift items weighing up to 10 pounds, to stand and/or walk about six hours in a normal workday and to sit with normal breaks for about six hours in an eight-hour workday, but that she had a limited ability to push and/or pull in the lower extremities. (R. at 197.) Johnson opined that Ringley could frequently climb and balance, and occasionally stoop, kneel, crouch and crawl. (R. at 199.) He established no manipulative, visual, communicative or environmental limitations. (R. at 200-01.) Based on the medical records examined, Dr. Johnson also noted that

Ringley's subjective complaints, symptoms and limitations were partially credible. (R. at 198, 202.) This assessment was affirmed by Dr. Donald R. Williams, M.D., another state agency physician, on December 28, 2004. (R. at 203.)

On October 7, 2004, and October 29, 2004, Ringley saw Dr. Kanwal with complaints of chronic lower back pain, which was aggravated by activity and was eased by heat and rest. (R. at 116.) A physical examination on October 7, 2004, found that Ringley had no weakness, no swelling of the extremities, no motor abnormality and that she was not in distress. (R. at 116.) Dr. Kanwal continued to diagnose degenerative joint disease and imaging of the cervical spine was ordered. (R. at 116.) A radiology report from an October 8, 2004, examination of the cervical spine is not entirely legible but does note that no subluxation or significant arthritic change was documented. (R. at 137.) Ringley's October 29, 2004, examination yielded similar results and she was diagnosed with disc degeneration and chronic pain. (R. at 115.) The record also contains an undated pulmonary history of Ringley in which she indicated that she had been smoking a pack of cigarettes a day for the last 23 years. (R. at 133.)

Lanthorn evaluated Ringley again on December 29, 2004, at the request of DDS. (R. at 204-10.) Lanthorn noted that Ringley was "in no apparent or significant distress." (R. at 204.) He found that she did not put forth an adequate effort on the tests she was given and that she was unmotivated. (R. at 204, 206, 208-210.) A second PRTF also was completed on December 29, 2004, by Eugenie Hamilton, Ph.D., a state agency psychologist. (R. at 211-24.) Hamilton found Ringley to be unmotivated and found her allegations to be only partially credible. (R. at 224.)

In December 2004, Ringley returned to Dr. Kanwal. (R. at 263.) Dr. Kanwal's notes continue to be illegible; however, it is clear that Ringley continued to complain of back pain which she described as a four to a seven on a scale of one to ten. (R. at 263.) On May 18, 2005, it appears that Ringley again was given a shot in the back. (R. at 259.) Additionally, another x-ray of the chest was performed, which again found spondylosis. (R. at 265.) An x-ray of the left and right knee found mild diagnostic changes. (R. at 264.) It appears that Ringley continued to complain of lower back pain and knee pain through the last of the records provided by Dr. Kanwal. (R. at 257-59.)

On September 15, 2005, Dr. Kanwal, completed a medical assessment of Ringley's physical ability to do work related activities. (R. at 254-56.) He found that in an eight-hour workday Ringley could lift items weighting up to 15 pounds occasionally, could lift items weighing up to 10 pounds frequently, could stand/walk no more than two to three hours, could sit no more than two to four hours, could never kneel, crouch, stoop or crawl and could climb and balance occasionally. (R. at 255-56.) Dr. Kanwal also stated that Ringley had a limited ability to reach and to push/pull, as well as being restricted from working around moving machinery. (R. at 256.) In support of these findings, the only non-subjective rationale provided by Dr. Kanwal was degenerative joint disease. (R. at 255-56.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).

-13-

This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 5, 2005, the ALJ denied Ringley's claim. (R. at 15-24.) The ALJ found that Ringley met the disability insured status requirements of the Act for disability purposes through the date of his decision. (R. at 23.) The ALJ also found that Ringley had not engaged in any substantial gainful activity since her alleged onset of disability. (R. at 23.) The ALJ noted that Ringley was a younger individual with a "marginal education." (R. at 23.) The ALJ determined, after careful examination of all the medical records, that Ringley's degenerative disc disease of the lumbar spine was a severe impairment. (R. at 23.) However, the ALJ found that none

of Ringley's impairments met or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 23.) The ALJ stated that the claimant's allegations of disabling pain and other limitations were not totally credible. (R. at 23.) The ALJ found that Ringley had the residual functional capacity to perform a significant range of simple, low stress work at the light level of exertion. (R. at 23.) As a result, the ALJ determined that Ringley could not perform any of her previous semi-skilled work and that she did not have any transferable skills. (R. at 23.) Based on Ringley's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ concluded that Ringley could perform jobs that existed in significant numbers in the national economy, including those of an inspector, a cleaner, a food services employee, a hand packer and an assembler. (R. at 24.) Therefore, the ALJ found that Ringley was not under a "disability," as defined in the Act, at any time through the date of his decision. (R. at 24.)

In her brief, Ringley argues that the ALJ erred in failing to accord proper weight to the opinion of her treating physician. (Memorandum In Support of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-12.) Ringley also argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 12-16.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the

Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

The court first will address Ringley's argument that the ALJ's residual functional capacity is not supported by substantial evidence. (Plaintiff's Brief at 12-16.) Specially, Ringley argues that the ALJ offered no findings as to specific functional limitations on Ringley's ability to perform light work which were identified by Dr. Johnson and Dr. Williams, state agency physicians. (Plaintiff's Brief at 13.)

Dr. Johnson and Dr. Williams noted that Ringley was limited in her ability to push and/or pull in her lower extremities and in her back. (R. at 197.) This limitation included a restriction on her ability to operate foot controls. (R. at 197.) Additionally, Dr. Johnson and Dr. Williams found that Ringley could occasionally stoop, kneel, crouch and crawl. (R. at 199.) The opinions of Dr. Johnson and Dr. Williams were relied upon heavily by the ALJ as a basis for his decision regarding Ringley's residual functional capacity. (R. at 20-21.) Additionally, these opinions were adopted by the ALJ over the opinions of Dr. Kanwal, the plaintiff's treating physician. (R. at 21.)

The Commissioner concedes that the ALJ did not include any of the limitations discussed above in his questioning of the vocational expert. (Defendant's Brief In Support Of Her [sic] Motion For Summary Judgment, ("Commissioner's Brief"), at 8-9.) In fact, the ALJ does not mention these findings and limitations from Dr. Johnson and Dr. Williams in any detail in his opinion. The Commissioner argues that these are nonexertional limitations which would have no effect on the outcome of this

-16-

case. (Commissioner's Brief at 9.) The Commissioner further argues that the *Dictionary of Occupational Titles*, ("DOT"), defines some of the jobs mentioned by the vocational expert as not requiring any stooping, kneeling, crouching and crawling, as well as not requiring the use of foot controls. (Commissioner's Brief at 9.) In his opinion, the ALJ did note that Ringley's exertional limitations did not allow her to perform the full range of light work. (R. at 24.) However, the ALJ did not include any limitation in his hypothetical questioning of the vocational expert to address the relevant findings of Dr. Johnson and Dr. Williams regarding the range of light work the claimant could perform.

The court notes that some of the limitations in question are nonexertional limitations, such as stooping, kneeling, crouching and crawling. *See* 20 C.F.R. §§ 404.1569a(c), 416.969a(c) (2006). However, despite the Commissioner's insistence to the contrary, not all of the limitations in question are nonexertional. Exertional limitations include anything which impacts a claimant's ability to meet the strength demands of a job such as sitting, standing, walking, lifting, carrying, pushing or pulling. *See* 20 C.F.R. §§ 404.1596a(b), 416.969a(b) (2006). Included in the limitations in question in this case were specific findings that the claimant was limited in her ability to push and/or pull. (R. at 197.) These limitations were not discussed by the ALJ in his opinion, and these limitations are certainly exertional based on the regulations.

The definition of light work specifically states:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . a job

-17-

is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. §§ 404.1567(b), 416.967(b) (2006). In order to be considered able to perform light work, an individual must be capable of performing substantially all of the activities. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

In this case, exertional limitations were placed on Ringley's ability to push and/or pull by the state agency physicians, and, in fact, by all medical sources in the record. By failing to recognize and examine these limitations, it appears that the ALJ did not analyze all of the relevant evidence and sufficiently explain his findings. It is unclear to this court whether the claimant, with these limitations in place, would still be capable of performing substantially all of the requirements of light work found in 20 C.F.R. §§ 404.1567(b), 416.967(b). Thus, the ALJ's decision is not supported by substantial evidence. *See Sterling Smokeless Coal*, 131 F.3d at 439-40; *Hays*, 907 F.2d at 1456.

Additionally, the testimony of the vocational expert does not constitute substantial evidence for the purposes of judicial review where her testimony is not in response to a proper hypothetical question which fairly sets out all of a claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). In this case, the Commissioner extensively cites the vocational expert's findings to provide support for his theory that the ALJ's failure to include the limitations at issue has no impact on the outcome of the case. However, the hypothetical to the vocational expert did not fairly set out all of the claimant's impairments; thus, the vocational expert's testimony that certain jobs existed in the national economy, which Ringley could perform, does not

-18-

Case 2:06-cv-00057-GMW-PMS   Document 22   Filed 08/09/07   Page 18 of 19   Pageid#: 74

constitute substantial evidence to support the ALJ's finding. *See Walker*, 889 F.2d at 50.

Consequently, the ALJ's decision is not supported by substantial evidence. This court sees no reason to address the remaining issues presented by Ringley as the case will be remanded for further consideration.

*V. Conclusion*

For the foregoing reasons, the motion for remand filed by the plaintiff will be granted, the motion for summary judgment filed by the plaintiff will be denied and the motion for summary judgment filed by the Commissioner will be denied.

An appropriate order will be entered.

**DATED:** This 9th day of August, 2007.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE